**No. 25-30580**

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

---

United States of America,

Plaintiff - Appellee

v.

Charlie L. Simpson; Charles D. Gardner,

Defendants - Appellants

---

**On Appeal from**
United States District Court for the Western District of Louisiana
3:21-CR-153-2

---

**BRIEF OF APPELLANT CHARLES D. GARDNER**

---

SARA A. JOHNSON
700 Camp Street
New Orleans, Louisiana 70130
(504) 528-9500
sara@sarajohnsonlaw.com

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th CIR. Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Appellant Charles Gardner**

| | |
|---|---|
| Trial Counsel | Sara A. Johnson, New Orleans, LA |
| | H. Cameron Murray, Monroe, LA |
| Appellate Counsel | Sara A. Johnson, New Orleans, LA |

**Appellant Charlie Simpson**

| | |
|---|---|
| Trial Counsel | Michael Reese Davis |
| | Baton Rouge, LA |
| Appellate Counsel | Elizabeth Franklin-Best, Columbia, SC |

**Appellee**

| | |
|---|---|
| United States of America | Camille Domingue |
| | U.S. Attorney's Office, Lafayette, LA |

**Judges**

| | |
|---|---|
| Terry A. Doughty | United States District Judge |
| Kayla D. McClusky | United States Magistrate Judge |

/s/ Sara A. Johnson
Attorney for Charles D. Gardner

ii

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Charles Gardner respectfully requests oral argument. Issue No. 3 is particularly record intensive. Counsel for appellant is familiar with the proceedings below and welcomes the opportunity to answer any questions, as it may assist the Court.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ............................................ii

STATEMENT REGARDING ORAL ARGUMENT ................................ iii

TABLE OF CONTENTS ..............................................................................iv

TABLE OF AUTHORITIES ........................................................................ 1

JURISDICTIONAL STATEMENT ............................................................ 5

STATEMENT OF THE ISSUES ................................................................. 6

STATEMENT OF THE CASE .................................................................... 7

   I.   United and Trinity Home Care were large, successful companies in North Louisiana. ........................................................................... 7

      A.  Charles Gardner applied to work at United in 2012. ................ 8

      B.  Simpson applied to Alleon Capital for a receivables-based line of credit in 2016. .................................................................... 11

      C.  In March 2017, FNB demanded a deposit of certified funds. . 13

   II.  Four years after Jones fired Simpson and Gardner, the government indicted them. ......................................................... 16

SUMMARY OF THE ARGUMENT ........................................................ 24

ARGUMENT ............................................................................................. 26

   I.   The prosecution argued an invalid theory of fraud. ..................... 26

      A.  The standard of review is de novo. .......................................... 26

      B.  Related lower court litigation and pertinent facts. ................ 26

      C.  The object of the fraud, salary from United, was not bank property, as required by § 1344; and there was no evidence

tying any bonus or salary increase to any performance metric. .................................................................................33

D.　The error was not harmless. ...................................................37

II. The prosecution's trial presentation constructively amended the indictment. ..............................................................................38

A. The standard of review is de novo. ..........................................38

B. The government pursued a different object of the fraud at trial than it alleged in the indictment. ...........................................40

III. The district court placed limits on cross-examination that violated Mr. Gardner's right to present a complete defense. ......................44

A. The standard of review is de novo. ..........................................44

B. The parties' objections, the district court's rulings, and the barred cross-examination. .......................................................45

C. The barred testimony was admissible. ....................................57

D. The barred testimony was critical to Mr. Gardner's defense. ..65

CONCLUSION .................................................................................72

CERTIFICATE OF SERVICE .................................................................73

CERTIFICATE OF COMPLIANCE .........................................................73

# TABLE OF AUTHORITIES

**Cases**

*Agfa-Gevaert, A.G. v. A.B. Dick Co.*,
879 F.2d 1518 (7th Cir. 1989) ..............................................................58

*Bruton v. United States*,
391 U.S. 123 (1968) ...................................................................... passim

*California v. Trombetta*,
467 U.S. 479 (1984) ...............................................................................43

*Chambers v. Mississippi*,
410 U.S. 284 (1973) .........................................................................65, 71

*Chapman v. California*,
386 U.S. 18 (1967) .................................................................................43

*Crane v. Kentucky*,
476 U.S. 683 (1986) .........................................................................43, 70

*Davis v. Alaska*,
415 U.S. 308 (1974) .................................................................43, 70, 71

*Delaware v. Van Arsdall*,
475 U.S. 673 (1986) .........................................................................43, 70

*Hafdahl v. Johnson*,
251 F.3d 528 (5th Cir. 2001) ................................................................57

*Kelly v. United States*,
590 U.S. 391 (2020) .........................................................25, 26, 32, 33

*Neder v. United States*,
527 U.S. 1 (1999) .............................................................................25, 36

*Olden v. Kentucky*,
488 U.S. 227 (1988) ...............................................................................43

*Pasquantino v. United States*,
544 U.S. 349 (2005) ...............................................................................26

*Pennsylvania v. Ritchie*,
480 U.S. 39 (1987) .................................................................................71

*Shaw v. United States*,
580 U.S. 63 (2016) .........................................................................25, 33, 40

*Skilling v. United States,*
561 U.S. 358 (2010) ...................................................................... 33, 34

*Smith v. Illinois,*
390 U.S. 129 (1968) ............................................................................ 71

*Stirone v. United States,*
361 U.S. 212 (1960) ............................................................................ 42

*United States v. Arlt,*
252 F.3d 1032 (9th Cir. 2001) ........................................................... 40

*United States v. Bellew,*
369 F.3d 450 (5th Cir. 2004) ............................................................. 25

*United States v. Brown,*
303 F.3d 582 (5th Cir. 2002) ............................................................. 62

*United States v. Bush,*
70 F.3d 557 (10th Cir. 1995) ............................................................. 40

*United States v. Cantu,*
167 F.3d 198 (5th Cir. 1999) ............................................................. 60

*United States v. Crinel,*
No. 15-cr-61, 2016 WL 6441249 (E.D. La. Nov. 1, 2016) ..................... 63

*United States v. DaVita Inc.,*
No. 1:21-CR-00229-RBJ, 2022 WL 833368 (D. Colo. Mar. 21, 2022) .. 63

*United States v. Ebron,*
683 F.3d 105 (5th Cir. 2012) ............................................................. 60

*United States v. Evans,*
892 F.3d 692 (5th Cir. 2018) ............................................................. 61

*United States v. Ghailani,*
761 F. Supp. 2d 114 (S.D.N.Y. 2011) ................................................. 63

*United States v. Hoover,*
467 F.3d 496 (5th Cir. 2006) ............................................................. 39

*United States v. Hughes,*
230 F.3d 815 (5th Cir. 2000) ............................................................. 62

*United States v. Jara-Favela,*
686 F.3d 289 (5th Cir. 2012) ............................................................. 42

2

*United States v. McMillan,*
  600 F.3d 434 (5th Cir. 2010) ........................................................37, 39

*United States v. Neal,*
  36 F.3d 1190 (1st Cir. 1994)...............................................................60

*United States v. Roshko,*
  969 F.2d 1 (2d Cir. 1992)..............................................................40, 42

*United States v. Ryan,*
  156 F.4th 583 (5th Cir. 2025).............................................................33

*United States v. Simmons,*
  773 F.2d 1455 (4th Cir. 1985) ............................................................58

*United States v. Skelton,*
  514 F.3d 433 (5th Cir. 2008) ..............................................................43

*United States v. Stadtmauer,*
  620 F.3d 238 (3d Cir. 2010)................................................................63

*United States v. Steel,*
  759 F.2d 706 (9th Cir. 1985) ..............................................................58

*United States v. Valas,*
  40 F.4th 253 (5th Cir. 2022)...............................................................62

*United States v. Vosburgh,*
  602 F.3d 512 (3d Cir. 2010)................................................................57

*United States v. Yanez Sosa,*
  513 F.3d 194 (5th Cir. 2008) ..............................................................60

*United States v. Yates,*
  16 F.4th 256 (9th Cir. 2021)..............................................32, 34, 35

*Wilkerson v. Cain,*
  233 F.3d 886 (5th Cir. 2000) ..............................................................68

*Yates v. United States,*
  354 U.S. 298 (1957) ...........................................................................36

**Statutes**

18 U.S.C. § 1344............................................................................. passim

18 U.S.C. § 1349............................................................................. 15, 25

28 U.S.C. § 1291.................................................................................... 4

**Other Authorities**

Pattern Jury Instructions (Criminal Cases) (Fifth Circuit District
Judges Ass'n 2024) § 2.58A ................................................................. 40

*Sixth Amendment at Trial,* 91 Geo. L.J. 584 (2003) .............................. 68

**Rules**

Fed. R. Evid. 602 ................................................................................. 60

Fed. R. Evid. 701 ........................................................................... 45, 60

Fed. R. Evid. 801(c) ............................................................................ 57

Fed. R. Evid. 802 ................................................................................ 57

## JURISDICTIONAL STATEMENT

Title 28, U.S.C. § 1291 confers jurisdiction to this Court as an appeal from a final judgment of conviction and sentence in the United States District Court for the Western District of Louisiana. Appellant timely filed his notice of appeal in accordance with Rule 4(b) of the Federal Rules of Appellate Procedure.

## STATEMENT OF THE ISSUES

1.      The bank fraud statute, 18 U.S.C. § 1344, demands that bank funds be the object of the scheme to defraud. The prosecution argued that Gardner's salary and bonuses from his non-bank-employer were the object of the scheme to defraud. Did the prosecution argue an improper and legally insufficient theory of fraud?

2.      A constructive amendment occurs when the prosecution convicts the defendant on a materially different theory or set of facts than that charged. The indictment alleged the object of the scheme was to fraudulently obtain money and credits from the banks. The prosecution's trial presentation, however, identified the object as Gardner's pay raises and bonuses from his non-bank-employer. Did the prosecution's trial presentation constructively amend the indictment?

3.      The Constitution guarantees a meaningful opportunity to present a complete defense. The district court restricted Gardner's cross-examination of Kassidy Broussard, the lead witness against him, barring specific questions and entire areas, including her thoughts, impressions, and perceptions based on her years working in the accounting department with Gardner; her previous statements that Simpson, not Gardner, instructed her to prepare the Peoples Bank checks; and her previous statements that Gardner never initiated a bank transfer. Did the district court's limitations on Broussard's cross-examination deny Gardner the right to present a complete defense?

## STATEMENT OF THE CASE

### I. United and Trinity Home Care were large, successful companies in North Louisiana.

United Home Care and Trinity Home Care (the companies) provided home healthcare services in North Louisiana.[1] They had a reputation as a successful business and the largest home health company in the area.[2] John "Danny" Jones was the sole owner of both companies.[3] These profitable companies earned revenue from Medicare, Medicaid, and private health insurance companies.[4] Jones, however, did not pay payroll taxes that, with penalties and interest, resulted in a seven-figure debt.[5] Jones hired Charlie Simpson to be the Chief Financial Officer, and promoted him to Chief Operating Officer.[6] The companies grew substantially over the years to 450 employees that served 2,500 patients.[7]

Jones was the sole signatory for the companies' bank accounts.[8] The companies had accounts at three banks. Income from Medicare and

---

[1] ROA.7718.
[2] ROA.5290.
[3] ROA.9756, 9758, 9760.
[4] ROA.6191-92.
[5] ROA.10200, 5290, 5295, 6063.
[6] ROA.9635.
[7] ROA.6183-84, 8055-91.
[8] ROA.9733, 9736, 9738, 9742, 9817, 9819, 9821, 9824, 9990.

7

Medicaid was deposited into accounts at Origin Bank. But payroll and operating expenses were paid out of First National Bank (FNB) accounts. Funds were regularly moved from Origin to FNB to meet payroll and pay expenses.[9]

### A.   Charles Gardner applied to work at United in 2012.

Mr. Gardner applied to United through the CareerBuilder website.[10] Simpson hired Gardner for the position variously referred to as Controller or CFO. The director of human resources and Simpson set salaries and determined bonuses.[11]

Gardner oversaw the accounting department, which included accounts receivable, accounts payable, and payroll. Despite his title as controller and CFO, Gardner had no authority to approve or deny expenses.[12] Nor did he have online access to the FNB and Peoples Bank accounts.[13] He was able to log on and view the Origin accounts online but he did not (and could not) conduct online transactions.[14] He did not have authority to transact or transfer in any account. Gardner asked to be able

---

[9] ROA.5614.
[10] ROA.9569.
[11] ROA.9984-9989.
[12] ROA.5788.
[13] ROA.5610.
[14] ROA.9861, 9902, 9909.

8

to view all of the bank accounts in real time online, but was denied. Gardner and his colleague in the accounting department, Kassidy Broussard, were frustrated by this, as it made their jobs difficult.[15]

The companies used Accounting CS software to track income and expenses, but this program did not sync to the companies' bank accounts online.[16] The accounting department had to reconcile the accounts after-the-fact, comparing the previous month's bank statement to its records of checks written.[17] The companies did not have a uniform method for cutting checks, either. Some were printed, some were handwritten, and some payments were made electronically.[18] Checks were written and bills were paid outside of the accounting department, such that the accounting department did not know what the payment was for.[19] They would have to ask the bank to learn more about a certain debit so that they could code it or apply it to an account payable.[20]

---

[15] ROA.5610.
[16] ROA.5603.
[17] ROA.5608-13.
[18] ROA.5602.
[19] ROA.5606, 5608-09, 10400, 10414.
[20] ROA. 5611-12, 10417-18.

To improve the companies' procedures, Gardner and Broussard prepared guidelines for accounts payable.[21] These guidelines set forth procedures for entering and storing invoices so that the companies' expenses could be tracked, coded, and correctly recorded in the financial statements.[22] These procedures created better records for the company and improved transparency.[23]

The accounting department freely shared its records, check registers, balance sheets, and financial statements with the companies' outside CPA firm that prepared its taxes.[24] The CPA firm never identified any issues with the companies' records or financial health.[25]

United's accounting department was also tasked with keeping track of income and expenses for DMJ United and DMJ Rentals, Danny Jones's rental property and limousine companies.[26] Gardner instructed Broussard to code Jones's personal expenses paid by the companies to the DMJ accounts as "owed to" the companies.[27] The accounting department

---

[21] ROA.5781, 10401.
[22] ROA.5783.
[23] ROA.5792.
[24] ROA.5794.
[25] ROA.5794-95.
[26] ROA.5604.
[27] ROA.5786.

could not predict these expenses, and only learned of them after they were incurred.[28]

At Simpson's direction, the accounting department carried out regular transfers of funds between Jones's bank accounts.[29] Kassidy Broussard and Theresa Steinbruck, who worked in the accounting department and disavowed any intent to defraud or intent to harm the banks, lamented the transfers as a distraction from their work duties.[30] Broussard confirmed that without real-time access to all of the bank accounts, Gardner could not have calculated the amounts of the transfers.[31]

## B.    Simpson applied to Alleon Capital for a receivables-based line of credit in 2016.

To help manage the companies' cash flow, in January 2016, Simpson applied to Alleon, a company specializing in healthcare receivables financing.[32] Simpson and Ginger Ezell, the companies' Director of Operations, exclusively, communicated with Alleon.[33]

---

[28] ROA.5786.
[29] ROA.5565, 5858.
[30] ROA.5600, 5828, 5858, 5919.
[31] ROA.5858.
[32] ROA.7829, 7835.
[33] ROA.4987-91, 10209, 10212, 10218, 10224.

11

Gardner was not looped in until later, providing Alleon with records in September 2016.[34] Gardner timely provided everything that Alleon requested, which was reviewed by Alleon's underwriters before the loan closed.[35] Gardner made sure that the first draw went to paying off the companies' tax debt.[36]

Alleon calculated the borrowing base for the line of credit from weekly reports of the companies' receivables, which Alleon analyzed to calculate an estimated collectable value.[37] With the line of credit in place, the companies' receivables were deposited into an account that Alleon controlled, and the companies would inform Alleon weekly how much to disburse, whether to apply receivables to the loan balance, or whether to draw more from the line of credit.[38] This put additional strain on the companies' cash flow by delaying receipt of its receivables by a few days.[39] The companies continued this arrangement with Alleon for the rest of

---

[34] ROA.4992-94, 10116.
[35] ROA.4980-83, 4998-5003, 5041-42, 7709.
[36] ROA.4928-29, 7848, 10198.
[37] ROA.5047-53.
[38] ROA.4938-44, 7915-25.
[39] ROA.4973-74.

2017, after Gardner was fired, and until the companies defaulted on the loan in January 2018.[40]

### C. In March 2017, FNB demanded a deposit of certified funds.

With the companies' FNB accounts in overdraft status and checks payable coming in, FNB requested a deposit of certified funds to bring the accounts current.[41] On Thursday, March 9, 2017, Simpson requested and obtained certified funds—four cashier's checks—from the companies' accounts at Origin. Gardner was not involved.[42] At the same time, Simpson corresponded with Origin about an expected chargeback on the companies' accounts. Gardner was not a party to these communications.[43]

Having received the deposit of certified funds, FNB presented the cashier's checks to Origin for payment. On March 10, 2017, aware of the chargebacks and insufficient funds in the companies' accounts, Origin returned the cashier's checks because they were not endorsed. That same

---

[40] ROA.4949, 10206. Ezell and Jones actively misled Alleon for months, copying Gardner on emails to Alleon, even though he was longer with the companies. ROA.4962.

[41] ROA.5202, 5252.

[42] ROA.6487-88.

[43] ROA.8302, 8404.

day, Jones withdrew $600,000.00 from FNB for deposit into the Origin

accounts[44]:



03/10/2017   Deposit   $200,000.00

03/10/2017   Deposit   $400,000.00

DEFENDANT'S EXHIBIT 743

Jones fired Simpson and Gardner on March 13, 2017.[45] Jones

endorsed the cashier's checks and re-deposited them at FNB on March

14. Origin paid the checks on March 15:[46]

---

[44] ROA. 8205, 8281, 10397.
[45] ROA.5883.
[46] ROA.10043 (Ex. 628).

14



After Jones fired Simpson and Gardner, the account activity carried on very much the same, with significant movement of funds between accounts.[47]

---

[47] ROA.5303-05, 10370 (Ex. 742) (more than $1,500,000.00 in telephone and internet transfers in the three weeks after Simpson and Gardner were fired), ROA.10398 (Ex. 744) ($400,000.00 withdrawn from United's account at FNB, payable to Origin Bank).

## II.    Four years after Jones fired Simpson and Gardner, the government indicted them.

The grand jury returned a five-count indictment against Mr. Simpson and Mr. Gardner on June 30, 2021 that charged them with one count of conspiracy to commit bank fraud, 18 U.S.C. § 1349, and four substantive counts of bank fraud, 18 U.S.C. § 1344(1).[48] The conspiracy count alleged a circular check kiting scheme and identified FNB, Origin Bank, and Peoples Bank as the financial institutions. The four substantive counts concerned four cashier's checks drawn on United and Trinity accounts at Origin on March 9, 2017.[49]

Trial was scheduled to begin in September 2023 but was continued at the last minute when the government produced copies of the cashier's checks underlying the substantive bank fraud counts that, for the first time, revealed that the checks had been returned for lack of endorsement, then endorsed by Jones, and honored.[50]

Trial commenced on April 8, 2024. The government's witnesses can be grouped into three categories: 1) witnesses from Alleon Capital, FNB,

---

[48] ROA.10717.
[49] ROA.10722-23.
[50] ROA.14421.

Peoples Bank, and Origin Bank; 2) United employees; and 3) its case agent, an FDIC examiner, and its in-house expert witness.

Witnesses from Alleon Capital described their site visit to United and the receivables-based financing it provided for healthcare companies.[51] Whatever records they asked for, Gardner provided.[52] The witnesses confirmed that the bank statements and financial statements that Gardner provided were honest records, that Alleon's underwriting department reviewed them and did not identify any issues, and after that review, decided to proceed with the loan.[53]

Mike McGee managed the companies' accounts at FNB.[54] Out of the dozens of messages emails introduced through Mr. McGee, only one was with Mr. Gardner: McGee wrote Gardner and asked that money be deposited into the DMJ Rentals account to cover a $3,683.23 check.[55] McGee confirmed that this shortfall did not prompt him to request certified funds weeks later.[56] McGee never discussed the companies'

---

[51] ROA.4858.
[52] ROA.4998.
[53] ROA.5003, 5040-42 5044, 5059.
[54] ROA.5195.
[55] ROA.5259, 9228.
[56] ROA.5297.

17

loans with Gardner.[57] Not one of the seven witnesses from Origin Bank knew Gardner or had any communication with him.[58] Neither did Stan Elkins of Peoples Bank.[59]

Ms. Broussard worked under Mr. Gardner in the accounting department at United, handling payroll and accounting.[60] Her testimony is addressed in detail in Section III, *infra.* Theresa Steinbruck also worked in the accounting department, handling payables.[61] She testified concerning the group text messages and her preparation of checks for deposit.[62]

Ginger Ezell was the companies' Director of Operations. She oversaw the billing department and other clerical functions.[63] Ms. Ezell testified about billing Medicare, Medicaid, and private payors on a weekly basis.[64] When the companies billed Medicare, there was a

---

[57] ROA.5290.

[58] *See, e.g.,* ROA.6166, 6170, 6181, 6487.

[59] ROA.6481-82.

[60] ROA.5526.

[61] ROA.5898.

[62] ROA.5902-06.

[63] ROA.6185.

[64] ROA.6419.

18

significant likelihood that the claim would be paid. It was reliable money. It was consistently paid.[65]

The FDIC examiner confirmed the status of the three banks at issue.[66] He also confirmed that the FDIC was not involved in the investigation or prosecution of this case and did not pursue any enforcement action against Mr. Gardner.[67]

The case agent read lengthy "summaries" of text messages that he excerpted from Simpson's phone.[68] The messages contained deposit instructions that identified accounts and amounts. There were messages by and between Simpson, Gardner, Broussard, Ezell, and Steinbruck. Even though they were at times portrayed as being exclusively between Gardner and Ezell, for example, because they were taken from Simpson's phone, Simpson was necessarily a party to the chat.[69] The case agent selected the messages to use at trial but often excluded the originating message, making it appear as though the message originated from

---

[65] ROA.6421.

[66] ROA.4851-52.

[67] ROA.4854-55.

[68] *See* testimony beginning at ROA.6799, ROA.7423 (Ex. 3), ROA.7496 (Ex. 4).

[69] ROA.6928-30.

Gardner, when it actually originated from Simpson.[70] For example, the government presented Ex. 005-004[71]



But this message was copied-and-pasted from Simpson's message a minute earlier[72]:



There were many more examples like this.[73]

---

[70] ROA.6930-44.
[71] ROA.7514.
[72] ROA.10472 (Ex. 835.642).
[73] ROA.6930-44.

20

Finally, the government called its expert witness, Carl Richard, a certified fraud examiner who worked at the U.S. Attorney's Office.[74] Richard scheduled Jones's companies' bank accounts and made pivot tables.[75] He gave a tutorial on check kiting.[76] He tallied all of the transfers to yield huge sums,[77] and opined that he observed kiting activity.[78] The analysis did not segregate or exclude the transfer of funds from Origin to FNB to make payroll, the companies' biggest expense.[79] Richard conceded that his analysis was not in accordance with generally accepted accounting principles,[80] and that his analysis counted money every time it was moved, no matter how many times the same money may have been moved.[81] Richard did not investigate or examine the hundreds of thousands of dollars of withdrawals made from the companies' accounts in the form of gift cards, credit card payments, and other expenditures.[82] One of his schedules, introduced by Gardner, not

---

[74] ROA.6955, 6958.
[75] ROA.6967, 6971.
[76] ROA.6961-62.
[77] ROA.6985.
[78] ROA.6987, 6991.
[79] ROA.7030-31.
[80] ROA.7017.
[81] ROA.7022-25.
[82] ROA.7025-28.

the government, revealed $1,058,872.24 in withdrawals for Jones's personal expenses over a 15-month period, even though it received only $58,000 in third-party deposits.[83]

The government did not call the companies' owner, Danny Jones.

The jury deliberated for a day and a half, sending seven questions.[84] It convicted Gardner of the bank fraud conspiracy, but did not return a verdict on the four substantive counts, later dismissed.[85] The district court denied Gardner's post-trial motions,[86] and calculated his guideline range to be 70 to 87 months.[87] Noting that the guideline range was higher than he would have expected for only one count of conviction, and considering Gardner's limited role, the district judge varied downward and imposed a 48-month sentence.[88] The court ordered $2,116,032.70 in restitution, with $1,516,032.71 payable to Origin Bank, and $600,000.00 payable to Alleon Capital Partners, LLC, which is not an FDIC-insured institution.[89]

---

[83] ROA.7031,7046.
[84] ROA.15263.
[85] ROA.15270, 14831.
[86] ROA.14776.
[87] ROA.15020.
[88] ROA.15021.
[89] ROA.15022. FNB and Peoples Bank did not lose money, and thus were not owed restitution.

22

The district court granted Mr. Gardner bail pending appeal, but the government moved for reconsideration, and the district court reversed itself, ordering Mr. Gardner to report to prison.[90]

---

[90] ROA.14843, 14849, Doc. 470.

## SUMMARY OF THE ARGUMENT

The indictment charged bank fraud and identified the object of the fraud as money and credits from the banks. The government conceded, however, that the object it pursued at trial was Gardner's salary and bonuses from his non-bank-employer. This was a legally insufficient theory of fraud; the object of the fraud wasn't the bank's property; and there wasn't evidence tying a pay raise or bonus to any metric about which Gardner lied. This Court should vacate Gardner's conviction.

Alternatively, the object pursued at trial constructively amended the indictment because the government convicted Gardner on a materially different theory than that charged. The remedy for this claim is also vacatur.

Finally, the district court restricted Gardner's cross-examination of Kassidy Broussard, the lead witness against him, barring specific questions and entire areas, including her thoughts, impressions, and perceptions based on her years working in the accounting department with Gardner; her previous statements that Simpson, not Gardner, instructed her to prepare the Peoples Bank checks; and her previous statement that Gardner never initiated a bank transfer. These

24

limitations denied Gardner the right to present a complete defense because the government opened, presented evidence, and closed on these topics. The remedy for this claim is a new trial.

## ARGUMENT

### I.  The prosecution argued an invalid theory of fraud.

#### A.  The standard of review is de novo.

This Court reviews a district court's denial of a post-trial motion for a judgment of acquittal de novo. *United States v. Bellew*, 369 F.3d 450, 452 (5th Cir. 2004).

#### B.  Related lower court litigation and pertinent facts.

Count One charged the defendants with violating 18 U.S.C. § 1349, which makes it a crime to "conspire[ ] to commit any offense under this chapter"—here, bank fraud. Bank fraud entails "knowingly execut[ing] ... a scheme or artifice ... to defraud a financial institution." *Id*. § 1344. A scheme to defraud "must be one to deceive the bank and deprive it of something of value," that is, money or property. *Shaw v. United States*, 580 U.S. 63, 72 (2016); *see also Kelly v. United States*, 590 U.S. 391, 389-99 (2020); *Neder v. United States*, 527 U.S. 1, 20–21 (1999) (construing "scheme or artifice to defraud" identically for the mail, wire, and bank fraud statutes). That property deprivation "must play more than some bit part in a scheme"—the loss to the victim "must be an 'object of the fraud,'" not a mere "implementation cost[ ]" or "incidental byproduct of

26

the scheme." *Kelly*, 590 U.S. at 402 (*quoting Pasquantino v. United States*, 544 U.S. 349, 355 (2005)).

Here, the indictment properly alleged that the object of the conspiracy was to fraudulently obtain money and credits from the banks.[91] The "manner and means" section alleged that the check-kiting scheme artificially inflated balances at the banks, which were used to cover "business costs, but also personal spending of company executives, including Simpson, and payroll expenses, including the salaries of Simpson and Gardner."[92]

Mr. Gardner flagged this issue before, during, and after trial. Knowing that he did not obtain any money or credits from the banks, he filed a motion for a bill of particulars, asking the government to identify the "money and credits" that he obtained from each bank.[93] The district court denied the motion.[94] Gardner then moved in limine to exclude argument that his salary and bonuses were an object of the scheme, and

---

[91] ROA.10719 (para. C.).

[92] ROA.10720. The district court, in denying Mr. Gardner's post-trial motion, incorrectly characterized the indictment as alleging "an increase of salaries as to Simpson and Gardner." ROA.14779. The quoted language is the entirety of the indictment's allegation on this point.

[93] ROA.12930.

[94] ROA.13559.

27

to bar the government from arguing or suggesting that the receipt of his salary affects in any way his guilt or innocence of the charged offense.[95] The district court ruled that "the object of the fraud cannot be to deceive the bank while continuing to draw an existing salary" but that it "may be to get a higher salary."[96] Thus, "to be allowed to argue that the object of the fraud was Gardner's salary, the Government must show the object of the fraud was for Gardner to receive a higher salary, not to keep an existing salary."[97]

During trial, the government offered evidence of Gardner's salary dating to 2005, long before he began working at United in 2012, and years before the charged conspiracy began in 2016.[98] Gardner objected, and when it became clear the evidence would be allowed, asked for a limiting instruction, which was denied.[99] The government detailed every single pay raise, vehicle allowance, and bonus.[100] It repeated this presentation with the company's payroll journal and a second witness.[101]

---

[95] ROA.14293.
[96] ROA.14435.
[97] ROA.14435.
[98] ROA.5086, 9536.
[99] ROA.5087, 5092.
[100] ROA.5093-5101.
[101] ROA.5528-37, 9520.

Upon hiring Mr. Gardner in April 2012, United paid him a starting annual salary of $52,000 and enrolled him in the company's quarterly bonus program.[102] The company approved pay increases after 90 and 180 days, bringing his salary to approximately $67,000 annually.[103] On January 1, 2014, his salary increased to $78,000.[104] On December 8, 2014, his salary increased to $85,000.[105] On January 18, 2016, his salary increased to $100,000.[106] Each raise was documented in Mr. Gardner's file and approved by the director of human resources and Mr. Simpson.[107]

Mr. Gardner (and all executive staff) worked for both United and Trinity, even though they only received a salary from United.[108] The companies grew substantially from 2012 to 2017 to 450 employees that served approximately 2,500 patients.[109] Origin Bank's review of the companies' capacity to service its debt indicated positive net cash flow after withdrawals for 2013, 2014, and 2015.[110] The companies' tax

---

[102] ROA.9600-01. Simpson's starting salary as United's CFO in 2011 was $121,940, more than twice Gardner's starting salary for the same position. ROA.5103.
[103] ROA.9598-99.
[104] ROA.9596.
[105] ROA.9597.
[106] ROA.9595.
[107] ROA.9573, 9595-601.
[108] ROA.5825.
[109] ROA.6183-84, 8055-91.
[110] ROA.9843.

returns and financial statements demonstrated growth and profitability: in 2015, United's 2015 reported business income was $389,194.00 and Trinity's was $1,606,593; current earnings for 2015 and 2016 were $560,883.47 (United) and $1,791,684.03 and $1,313,612.01 (Trinity).[111]

Mr. Gardner's salary was commensurate with the companies' other executives and for a business of this size, especially considering that the company didn't provide health insurance, retirement or 401(k) plans, or stock options:[112]

**United Home Care and Trinity Home Health Care**
**Employee Pay - Ranked**
**for 2016**

| | NAME | POSITION | 2016 W-2 |
|---|---|---|---|
| 1 | Jones, John D. | CEO/Owner | 500,000.16 * |
| 2 | Simpson, Charlie L. | Chief Operating Officer | 330,731.89 |
| 3 | Lewis, Mary-Taylor B. | Director of Marketing | 248,004.83 |
| 4 | Gardner, Charles | Controller/CFO | 170,145.10 |
| 5 | Evans, Wana | Asst. Direcor of Nursing - Private Pay | 135,285.62 |
| 6 | Ong, Sharon B. | Director of Therapy | 126,315.26 |
| 7 | Fulmer, Autumn | Regional Director of Nursing | 125,969.47 |
| 8 | Leggett, Heather N. | Marketer | 109,252.55 |
| 9 | Lane, Rhonda H. | Director - Therapy Education | 109,142.48 |
| 10 | Alexander, Katrina | Physical Therapist | 104,181.39 |
| 11 | McKee, Phillip A. | Physical Therapist | 103,251.71 |
| 12 | Ling, Jennifer P. | Physical Therapist | 102,621.52 |
| 13 | Castlemna, Tiffany A. | Director of Nursing | 90,662.25 |
| 14 | Ezell, Ginger | Director of Operations | 86,682.14 |
| 15 | Jenkins, Lisa M. | Transition Director | 82,871.73 |

*Reflects $400,000.00 distribution on paycheck. Jones's W-2 shows a salary of $100,000.00, but his total withholdings were $98,650.10, leaving $1,349.90 in net annual earnings. Because his bi-weekly paychecks exceeded $14,000.00, this distribution is considered a guaranteed payment and treated as salary.

---

[111] ROA.9952, 9970, 10421, 10424.
[112] ROA.5881, Doc. 420-1 at 3.

No evidence linked any raise or any bonus to Mr. Gardner's actions. There was no communication about financial goals for the company, no schedule tying a bonus to any activity or threshold, and no circumstantial evidence linking any transfer to any pay raise. The best the government mustered was a message where Gardner thanked his boss for the raise and for his confidence in him.[113] The government's expert fraud examiner testified that Gardner received only his paycheck.[114] That salary, and each raise, was approved by the director of human resources, who was not a co-conspirator.[115] Gardner never gave himself a raise, never gave himself a bonus, and never directed any company funds for his personal use.[116]

The prosecution's closing argument repeatedly urged the jury to convict Mr. Gardner because he received his salary from United, to the exclusion of any other viable theory. The government began its closing:

> Keeping the businesses afloat allowed Charlie Simpson and Charles Gardner to get increased salaries and quarterly bonuses. In 2016 alone, the defendants' combined pay was $500,000. Charlie Simpson, in just that one year, received bonuses of $143,000. And Charles Gardner received $67,000

---

[113] ROA.7481.
[114] ROA.7024.
[115] ROA.5175-78.
[116] ROA.5858-5860.

31

in bonuses, the same year they were struggling to pay bills. And when the scheme collapsed, the ship sank, and Origin Bank was stuck with a loss of over $3 million.[117]

In rebuttal, the prosecutor queried, "Where was the personal financial gain? We'll get to that in a minute."[118] And then answered her own question:

> No legitimate job should make you commit a federal crime in order to keep it. These are educated men with prior job experience. They not only knew better, but they could have easily left and obtained better employment or different employment. If Danny Jones' spending was the entire problem with this company, then why didn't they just quit? There was a better alternative.
>
> The defendants argue they didn't get any benefit from this scheme or in this conspiracy. Well, if that's true, if they got nothing out of this, why did they do it? Why didn't they quit?
>
> The defendants say they didn't get money in their pockets on March 10th. They didn't need to get that money on March 10th because they already had it. They had it all through 2016 when they got increased salaries, when they got bonuses.
>
> You're running a company with cash flow problems that can't pay its bills; but, yet, they got bonuses every quarter. They had 500,000 reasons to keep that job and to continue their scheme and

---

[117] ROA.7194-95.
[118] ROA.7268.

to continue their conspiracy. That's a lot of money.[119]

### C. The object of the fraud, salary from United, was not bank property, as required by § 1344; and there was no evidence tying any bonus or salary increase to any performance metric.

The government agrees that it pursued a salary theory of fraud, or that the salary was the object of the fraud, but claimed its focus on pay raises and bonuses was permitted.[120] There are two problems with the government's "increased salary" theory. First, the object—Gardner's salary from United—was not bank property, as required by § 1344 and *Kelly*. Second, there was no evidence tying any bonus or salary increase to the scheme. *Cf. United States v. Yates*, 16 F.4th 256, 268 (9th Cir. 2021) ("[I]f an employer offers a raise or a bonus tied to some specific performance metric, an employee who lies about having achieved that metric has deprived the employer of something of value.").

---

[119] ROA.7271-72.

[120] ROA.14714 ("The government's theory that the defendants received increased salaries and bonuses as the object of their fraud was appropriate and followed the Court's pre-trial ruling."); ROA.14717 ("The government's theory that increased salary and bonuses were the object of the fraud…").

And the government's concession separates this case from *United States v. Ryan*, where the government did not press such a theory. 156 F.4th 583, 594 (5th Cir. 2025).

The hallmark of property fraud (as distinct from honest services fraud) is that "the victim's loss of money or property supplied the defendant's gain, with one the mirror image of the other," *Skilling v. United States,* 561 U.S. 358, 400 (2010); s*ee also Kelly*, 590 at 401-02 (property fraud contemplates "taking of property"—that is, a scheme to "convert[]" it to defendant's benefit—causing "economic loss").

By choosing to indict Gardner for bank fraud, the government limited itself in two important ways. It had to prove that he *both* "deceive[d] [a] bank" and "deprive[d] it of something of value." *Shaw*, 580 U.S. at 71. But as described, *supra*, the government instead asked the jury to convict Gardner of scheming so that he could keep getting his salary from United, not one of the banks.

The government cannot claim that the bank's money flowed through United to Gardner. Its expert, Carl Richard, did not examine Gardner's salary or trace the source of the funds to pay Gardner's

34

salary.[121] Indeed, Mr. Richard emphasized that money was "fungible" and that he could not trace dollars.[122] So not only did the government argue that the object of the fraud was Gardner's salary from United, there were no facts upon which it could have argued that Gardner obtained bank property.

In *Skilling*, the Supreme Court rejected the government's theory that Skilling "conspir[ed] to defraud Enron's shareholders by misrepresenting the company's fiscal health, thereby artificially inflating its stock price," and that he had "profited from the fraudulent scheme ... through the receipt of salary and bonuses, ... and through the sale of approximately $200 million in Enron stock." 561 U.S. at 413 (ellipses in original). Even though *Skilling* charged honest-services fraud, courts have applied it to traditional fraud cases, including bank fraud. *See, e.g., Yates*, 16 F.4th at 267.

---

[121] ROA.7030 ("Q. And nowhere in here did you make an accounting for expenses once it was transferred, payroll expenses that were paid out of that? A. No, I didn't."); ROA.7031 ("Q. Payroll and legitimate business expenses are not  represented on this chart? A. No, they're not.").

[122] ROA.7022 ("The dollars become fungible, like, there's no way to identify dollar for dollar."); ROA.7025 ("Q. So it's your position that money is fungible? A. To the degree I can't identify it. No, I cannot identify individual dollars.").

In *Yates,* the defendants were bank employees whose salaries were, indisputably, bank property (unlike Gardner's). To get around the impermissible salary theory, the government argued that the "defendants' scheme went beyond an intent to maintain their salaries" because "[t]he board of directors used a performance-based system" of compensation. By making the bank's performance appear better than it actually was, the defendants obtained increased compensation. *Id.* at 268. But the *Yates* Court found no support in the record for that claim:

> We agree that if an employer offers a raise or a bonus tied to some specific performance metric, an employee who lies about having achieved that metric has deprived the employer of something of value. But the evidence at trial showed that the defendants were interested in receiving standard annual raises and end-of-year bonuses that were based on the bank's overall financial condition, not on any specific metric they falsified to obtain additional compensation.

*Id.*

While still not a solution to the problem that Gardner's salary was not bank property, there wasn't even evidence in his case of a lie to obtain a raise as in *Yates.* There was no evidence that Gardner's raises or bonuses were tied to any performance metric and were anything other than standard raises. The prosecution acknowledged this when it hedged

36

in closing that the defendants feared being fired and should have quit: "No legitimate job should make you commit a federal crime in order to keep it. … They not only knew better, but they could have easily left and obtained better employment or different employment. If Danny Jones' spending was the entire problem with this company, then why didn't they just quit?"[123]

The government cannot escape these three critical points: 1) it pursued a theory that salary and bonuses were the object of the fraud; 2) that salary was not bank property; and 3) there was no evidence that tied raises or bonuses to a performance metric about which Gardner lied.

## D.     The error was not harmless.

The government cannot meet its burden to show beyond a reasonable doubt that the invalid legal theory did not contribute to the jury's verdict. *Neder*, 527 U.S. at 19. It was the only theory the government pursued. The prosecution did not offer any other basis to the jury to convict Mr. Gardner. (But even if it did, the presence of even one insufficient legal theory requires the verdict to be set aside. *Yates v. United States,* 354 U.S. 298, 312 (1957).)

---

[123] ROA.2028.

37

Also weighing against harmlessness are the length of jury deliberations (10 hours for two defendants and five counts, with the substantive counts being identical), the number of juror questions (seven), and the split verdict against Gardner, convicting him of only the conspiracy count. These facts indicate a difficult case for the jury.

The government unabashedly pursued the salary theory by dwelling on every pay raise, bonus, and vehicle allowance with its witnesses. It then vigorously argued it in closing. Meanwhile, Gardner asserted in opening, cross-examination, and closing that he did not personally gain from the scheme.[124] The error was not harmless beyond a reasonable doubt.

## II. The prosecution's trial presentation constructively amended the indictment.

### A. The standard of review is de novo.

This Court reviews a claim that the prosecution constructively amended the indictment de novo. *United States v. McMillan*, 600 F.3d 434, 450 (5th Cir. 2010).

---

[124] ROA.4847-48, 5175-78, 5858-5860, 7024, 7246.

In denying Gardner's post-trial motions, the district court faulted him for not raising this issue before trial.[125] But constructive amendments occur at trial, so an objection cannot be raised before trial. Gardner, however, filed a motion in limine that sought to prevent the error that occurred—argument that his salary and bonuses were the object of the fraud and a basis to convict.[126] The words "salary" and "bonus" did not appear at all in the government's opening statement, so it was not clear then that the government intended to pursue this incorrect and unindicted theory. But when the government began to present copious evidence of Mr. Gardner's salary that predated his employment at United and the conspiracy, he objected.[127] The district court overruled all of Gardner's objections and denied his request for a curative instruction.[128] Given these many adverse rulings, any additional objection during the government's closing argument would have been futile.

---

[125] ROA.14781.
[126] ROA.14293.
[127] ROA.5087.
[128] ROA.5092.

### B.    The government pursued a different object of the fraud at trial than it alleged in the indictment.

Should the Court find that the government's theory that the object of the bank fraud was Mr. Gardner's salary and bonuses at United was legally sound, the Court should vacate the conviction nonetheless because the pursuit of this theory worked a constructive amendment of the indictment.

A constructive amendment occurs when the defendant is convicted on a factual basis that effectively modified an essential element of the offense charged or permitted the government to convict the defendant on a materially different theory or set of facts than that with which he was charged. *McMillan*, 600 F.3d at 451 (*citing United States v. Hoover*, 467 F.3d 496, 500-01 (5th Cir. 2006)).

The government's trial presentation constructively amended the indictment. The indictment alleged that the object of the conspiracy was to fraudulently obtain money and credits from the banks.[129] But the government's trial presentation instead asserted that the object of the fraud was increased salary and bonuses from United.[130] Thus, the

---

[129] ROA.10719.
[130] Section I(B), *supra*.

government convicted Gardner on a materially different theory than that charged by changing the object of the fraud.

This worked a constructive amendment because it altered the titular crime charged: a conspiracy to commit bank fraud under 18 U.S.C. § 1344(1). The object of the scheme to defraud is a necessary element of the crime. *See Shaw*, 580 U.S. at 72 (a scheme to defraud "must be one to deceive the bank and deprive it of something of value," that is, money or property); *see also* Pattern Jury Instructions (Criminal Cases) (Fifth Circuit District Judges Ass'n 2024) § 2.58A ("That the scheme or artifice was to defraud a financial institution, as alleged in the indictment[.]"). Courts have held that the object of a conspiracy under the broader 18 U.S.C. § 371 is an element of the offense. *See, e.g., United States v. Arlt*, 252 F.3d 1032, 1034 (9th Cir. 2001); *United States v. Bush,* 70 F.3d 557, 561 (10th Cir. 1995); *United States v. Roshko*, 969 F.2d 1, 5 (2d Cir. 1992) ("Without question, the object of a conspiracy constitutes an essential element of the conspiracy offense" defined by 18 U.S.C. § 371).

The government's broadening of an indictment's charges through proof at trial constructively amends an indictment. *Roshko* involved a conspiracy to defraud the United States whose object was expressly

41

defined as "seeking changes in the immigration status of an alien based on a sham marriage to a United States citizen that was falsely represented to be genuine." *Id.* at 2. At trial, the government introduced evidence that the defendant had conspired in the marriage of her future husband, an immigrant from Israel, to a United States citizen, in order to secure his green card. *Id.* at 3. It also offered evidence of that couple's subsequent divorce and of the defendant's marriage to her now-permanent-resident-alien husband (which ultimately resulted in her successful application for a green card). *Id.* When the defendant raised a statute of limitations challenge to the evidence of her husband's sham marriage, the government argued that the conspiracy broadly embraced both marriages, and that the prosecution was therefore timely. *Id.* at 4.

The Second Circuit, emphasizing that the indictment specifically charged a purpose to change the status of "an alien" through marriage to "a United States citizen," found that the indictment was not so broad as the government claimed. *Id.* at 5–6. It held that the unlimited introduction of evidence related to the second marriage, combined with the government's arguments that such conduct was part and parcel of the conspiracy, was impermissible because it "could easily have created a

42

basis for conviction which the grand jury did not intend to create." *Id.* at 6.

Here, the government presented evidence of Gardner's salary dating back to 2005—seven years before United hired him—and more than ten years before the charged conspiracy. It documented every pay raise, bonus, and vehicle allowance.[131] It then argued strenuously in closing that pay raises and bonuses were the object of the fraud.[132] The combination of this unlimited compensation evidence and argument was impermissible because it created a basis for conviction that the grand jury did not intend to create. *Roshko*, 969 F.2d at 6 (citing *Stirone v. United States*, 361 U.S. 212, 217 (1960)).

Constructive amendments to an indictment are reversible error; a showing of prejudice is not required. *United States v. Jara-Favela*, 686 F.3d 289, 299 (5th Cir. 2012). For these reasons, Mr. Gardner's conviction should be vacated.

---

[131] ROA.5093-101, 5528-37, 9520.
[132] ROA.7271-72.

**III. The district court placed limits on cross-examination that violated Mr. Gardner's right to present a complete defense.**

**A. The standard of review is de novo.**

This Court reviews alleged violations of a defendant's Sixth Amendment right to present a complete defense de novo, subject to harmless error review. *United States v. Skelton*, 514 F.3d 433, 438 (5th Cir. 2008). The Constitution, however, guarantees a meaningful opportunity to present a complete defense. *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (*citing California v. Trombetta*, 467 U.S. 479, 485 (1984)). Thus, if the Court finds a violation of this Constitutional right, it should reverse unless the government can show that the violation was harmless beyond a reasonable doubt. *Olden v. Kentucky*, 488 U.S. 227, 232 (1988); *Chapman v. California*, 386 U.S. 18, 24 (1967); *see also Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986) (the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to *Chapman* harmless-error analysis); *Davis v. Alaska*, 415 U.S. 308, 318 (1974) (denial of the right of effective cross-examination is constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it).

### B.    The parties' objections, the district court's rulings, and the barred cross-examination.

Kassidy Broussard worked under Charles Gardner in the accounting department. She was the government's lead witness against Mr. Gardner, and the most important witness to his defense. Ms. Broussard testified on April 11 and 12, 2024.

Relevant to the limitation of her cross-examination, on direct examination, Ms. Broussard testified that: 1) she received transfer instructions from Mr. Gardner and that Mr. Gardner supervised the transfers;[133] 2) she was a party to group text messages concerning the relay of transfer instructions, presented in a way that seemed as though Mr. Gardner instructed Ms. Broussard concerning the amount and timing of transfers, even though each message was a copy-and-paste of a message that originated from Mr. Simpson;[134] and 3) she met with Mr. Gardner on March 8, 2017 and he gave her transfers for the Peoples Bank account.[135]

The government completed its direct examination on April 11. Counsel for Mr. Gardner began to cross-examine Ms. Broussard. Near

---

[133] ROA.5566.
[134] *See generally* ROA.5567-94.
[135] ROA.5593-95.

the end of the day, and when there was not a question on the floor, the government asked to approach the bench.[136] A lengthy discussion ensued, and the government and counsel for Mr. Simpson lodged objections to unasked questions on the basis of *Bruton* and hearsay in an effort to bar significant lines of questioning.[137] The day concluded without a ruling.

The next morning, before the jury was called in, the hullaballoo about Gardner's unasked questions of Broussard resumed. Counsel for Gardner asserted that her anticipated questions were "critical to [] Mr. Gardner's defense," were permissible under Federal Rule of Evidence 701, and concerned "Ms. Broussard's…opinion, beliefs, understanding, knowledge."[138] Counsel for Gardner explained how barring cross-examination in these areas would be a Sixth Amendment violation and how the premature objections to unasked questions sought an advisory opinion.[139]

---

[136] ROA.5614.

[137] ROA.5614-31.

[138] ROA.5745-48.

[139] ROA.5751, 5764; *see also* ROA.5769 ("I strongly object to the idea that I am hamstrung in my client's Sixth Amendment right to cross examine essentially what is the lead witness against him from the government's perspective—or the government's case about, plainly, you know, anything that falls under 701 based on her own personal perceptions and observations.").

46

Especially at issue was Gardner's intention to question Broussard about her previous statements that contradicted her testimony on direct concerning the transfer instructions and the checks written off of the Peoples Bank account. An FBI Form FD-302 memorializing Broussard's interview recapitulated:

> On 03/08/2017, Charlie holds a meeting with the accounting department and instructs Broussard to write several checks on the Peoples Bank accounts. Gardner gives her the check book from Peoples Bank. She did what she was told then informed Gardner the completed checks were in his desk drawer. Broussard believed Theresa wasn't in the office that day because normally she would fill out the checks. Broussard wasn't sure what the checks were for but Simpson didn't like questions so she said nothing. She was concerned with the accounts because she knew the Peoples accounts didn't have money in them.[140]

Relatedly, Broussard swore in an affidavit that

> During my employment at United and Trinity, every bank transfer was initiated by Charlie Simpson. No bank transfers were ever initiated by Mr. Gardner. At or around the time he made a bank transfer, Mr. Simpson would inform Mr. Gardner and me of the details of the bank transfer via group text message. In fact, if Charles Gardner was out of the office, Simpson would send transfer orders which would be completed without any involvement or knowledge of Gardner. Should

---

[140] ROA.10517 (Proffered Ex. 754).

47

Charlie Simpson not be in the office, he would still send bank transfer directions via text message.[141]

The district court focused on *Bruton* because the government championed the *Bruton* cause more than 16 times, warning it that Gardner's expected examination of Broussard was a *Bruton* violation that would cause a mistrial.[142] Counsel for Simpson also objected based on *Bruton*. The government capitalized on this, imploring the court: "Your Honor, that Mr. Davis and I agree on something should be very indicative of the significance of this issue. I don't know what to tell you, Judge, other than if it's Bruton. And, if it happens, we're going to be here again."[143] Before Gardner's cross-examination of Broussard began that morning, the district court stated what it wanted "to avoid is [Broussard] saying anything about Charlie Simpson did it. I mean, but I think you have the right for your defense to say -- to ask if she has said something different that he didn't do that. But be sure to preface it by not -- you know, don't say any name, you know, or something -- well, because you don't even need to give them the name."[144]

---

[141] ROA.10499 (Proffered Ex. 719).
[142] ROA.5616, 5620, 5623, 5624, 5749, 5750-51, 5753, 5757, 5763, 5765, 5777, 5847.
[143] ROA.5750-51, 5763.
[144] ROA.5775.

48

Gardner's cross-examination of Broussard resumed until the following exchange:

> Q. And would you have to drop whatever you were working on to attend to [the text messages about transfers]?
> A. Yes.
> Q. Did you like having to do that?
> A. Absolutely not.
> Q. Did you know if Mr. Gardner liked having to do that?[145]

The government objected, asserting speculation. The parties approached the bench. The government further objected based on hearsay. Simpson lodged a *Bruton* objection. The district court found lack of foundation.[146] The court excused the jury and ordered Gardner, over his objection, to examine Broussard outside of the jury's presence, thus previewing his cross-examination to the government.[147]

Outside the jury's presence, Gardner laid significant foundation concerning the years Broussard worked with Gardner, that they worked together every day in close quarters, and her familiarity with his mannerisms, moods, attitude, tolerance for sloppy work and

---

[145] ROA.5828.
[146] ROA.5829.
[147] ROA.5839.

disorganization, and whether she could tell when he was irritated.[148]

Gardner then asked:

> Q. Without considering anything that Mr. Gardner might have said, how did Mr. Gardner feel about the text messages?
> A. He didn't care for them.
> THE COURT: He what? What was the answer?
> THE WITNESS: He did not care for them.
> Q. He did not like them?
> A. No.[149]

Simpson then questioned the witness:

> Q. [ ] The text messages that you were referring to were text messages that Mr. Gardner received from Mr. Simpson. Correct?
> A. Correct.
> Q. And the reason you know that Mr. Gardner didn't like them is because he told you that?
> A. Correct.
> MR. DAVIS: Bruton problem.
> THE COURT: Okay. Any questions from the prosecutor you want to ask?
> MR. WHITTEN: No, Your Honor. Mr. Davis said it well.[150]

Gardner then queried: "could you also tell from Mr. Gardner's moods, mannerisms and attitude that he did not like the text message instructions?" Ms. Broussard responded: "Correct."[151]

---

[148] ROA.5839-40.
[149] ROA.5840.
[150] ROA.5841-42.
[151] ROA.5842.

50

Still outside the jury's presence, Gardner questioned Broussard about the Peoples Bank checks:

> Q. Ms. Broussard, you testified on direct [ ] that Mr. Gardner told you to write the checks on the Peoples Bank accounts?
> A. Correct.
> Q. Now, you've met with the government a bunch of times, haven't you?
> A. Yes.
> Q. Do you recall that you told the government when you met with them that someone else instructed you to write the People's checks, not Mr. Gardner?
> A. I do not recall that.
> MS. JOHNSON: May I approach the witness?
> THE COURT: Sure.
> MR. WHITTEN: Your Honor, again, I'm going to object because the 302 is not her statement.
> THE COURT: I agree.
> MR. WHITTEN: It's prepared by the agent.
> THE COURT: If that's 302. If that's 302, you can't do it.
> MS. JOHNSON: The question is, "Do you recall?" We confirmed a meeting with the government. "Do you recall?" This is refreshing recollection –[.][152]

The district court ruled, "I'm not going to allow impeachment by a 302."[153]

The district court barred Gardner from refreshing the witness's recollection even *outside* the jury's presence, and altogether barred him

---

[152] ROA.5842-43.
[153] ROA.5844.

from questioning the witness about her prior statements that Simpson,
not Gardner, instructed her to write the Peoples checks. Gardner could
not even ask the broader question that someone *other than Gardner*,
without naming Simpson, instructed her to write the checks.

Still outside of the jury's presence, Gardner asked Broussard
questions based on her statements in a sworn affidavit:

> Q. Ms. Broussard, it's your testimony that no bank
> transfers were ever initiated by Mr. Gardner.
> Right?
> A. True.
> Q. And that would include transfers concerning
> Origin Bank. Correct?
> A. Yes.
> Q. Transfers concerning FNB Bank. Correct?
> A. Yes.
> Q. And transfers concerning Peoples Bank?
> A. To my knowledge, yes.[154]

Simpson's attorney then asked Broussard:

> Q. You don't have personal knowledge of all of the
> transfers, do you? You weren't involved in every
> transfer, were you?
> A. Yes, I was.
> Q. Every transfer?
> A. Yes.
> Q. And did you have conversations with Mr.
> Gardner?
> A. Yes.

---

[154] *Compare* ROA.5845 *with* ROA.10499 (para. 6).

> Q. And did you have conversation about --
> conversations with Mr. Gardner about who was
> initiating these?
> A. Yes.
> Q. And Mr. Gardner had communications with Mr.
> Simpson that you weren't privy to. Correct?
> A. Correct.
> Q. And so the response that you gave was based,
> at least in part, on what Mr. Gardner told you.
> Correct?
> A. Correct.[155]

Gardner then followed up:

> Q. Without considering anything that Mr. Gardner
> might have said to you, do you know whether any
> bank transfers were ever initiated by Mr.
> Gardner?
> A. Not to my knowledge.[156]

At the conclusion of Broussard's closed-door testimony, the government and Simpson again argued that Gardner's questions would violate *Bruton*. Gardner responded that the questions were necessary to his right to present a complete defense, citing *Washington v. Texas*.[157] The district court ruled:

> I do believe, after reading Bruton and looking at
> the cases, you know, after that, that it would be a
> Bruton violation for me to allow those questions,
> all three of them, all three areas that were asked
> because every single one of them was based upon

---

[155] ROA.5846.
[156] ROA.5846-47.
[157] ROA.5847.

53

> something that Mr. Simpson told her -- Mr. Gardner told her. … I'm not going to allow any questions on it because I believe it would be a Bruton violation and we'd be trying this case all over again.[158]

Following this ruling, and despite Gardner's assertions that there was not a question or statement that implicated *Bruton*, Gardner proffered for the record the FD-302 and Broussard's sworn affidavit, including proposed redactions to satisfy the (non-existent) *Bruton* concerns.[159] Even though all of the district court's reasons for barring the testimony cited *Bruton* by name and noted the prejudice to Simpson, before the jury was called back in, the government said, "the Court's ruling, as I understand, was also based on the hearsay rules as well and not strictly just Bruton." The court responded, "[y]eah, that's true."[160]

---

[158] ROA.5848-49. *See also* ROA.5853 ("But, you know, you can call your client if you wanted to. I mean, that's up to you. … But, I mean, it can't be gotten in this way because it's going to prejudice another defendant who can't cross examine anybody.").
[159] ROA.5850-56; ROA.10497 (Ex. 719); ROA.10503 (Ex. 719 redacted); ROA.10509 (Ex. 719 redacted differently); ROA.10515 (Ex. 754); ROA.10518 (Ex. 754 redacted). *See also* ROA.14625 (Gardner's Trial Brief concerning *Bruton* claims asserting that no *Bruton* issue existed, and requesting in the alternative a mistrial, a severance, or a limiting instruction).
[160] ROA.5857.

To summarize, the district court limited Gardner's cross-examination of Broussard by sustaining objections to the following questions, posed in front of the jury:

- "And these nonbudgeted personal expenses [by owner Danny Jones], did you understand Mr. Gardner to be frustrated by those?"[161]

- "Based upon your personal perceptions of what you observed while you worked in the accounting department, did you believe Mr. Gardner to be frustrated by these nonbudgeted personal expenses [by owner Danny Jones]?"[162]

- "Did you know if Mr. Gardner liked having to do that?"[163]

The district court also barred Gardner from asking any questions on three broad areas critical to his defense:

- Ms. Broussard's thoughts, impressions, and perceptions based on her years working in the accounting department with Mr. Gardner.

- Ms. Broussard's previous statements that Simpson, not Gardner, instructed her to prepare the Peoples Bank checks.

- Ms. Broussard's previous statements that Mr. Gardner never initiated a bank transfer.

In its opposition to Gardner's post-trial motions, the government conceded in a footnote, without more, that its "*Bruton* argument at trial

---

[161] ROA.5786-87.
[162] ROA.5787.
[163] ROA.5828 (referring to the transfers).

was misplaced."[164] The court's order denying Gardner a new trial on this claim focused on specific questions without recalling that it also issued a more generalized ruling that barred inquiry into three areas.[165] This oversight led the district court to conclude that Gardner did not question Broussard about the affidavit, even though he asked questions that tracked verbatim the affidavit that were barred, and proffered the affidavit.[166]

---

[164] ROA.14725, n.4.

[165] ROA.14798-803.

[166] *Compare* ROA.14802 *with* ROA.5845 ("Q. Ms. Broussard, it's your testimony that no bank transfers were ever initiated by Mr. Gardner. Right? A. True.") (outside jury's presence) *and* ROA.10499, para. 6 ("During my employment at United and Trinity, every bank transfer was initiated by Charlie Simpson. No bank transfers were ever initiated by Mr. Gardner.") (Ex. 719, proffered affidavit); *see also* ROA.5746 ("And if she does not recall, I can refresh her memory with the 302. I have yet another affidavit in which she swore that Mr. Gardner never initiated any transfers. So we have two separate statements where she is saying Mr. Gardner never initiated any of the transfer[s].") *and* ROA.5851 ("The second question that I'm not clear on is we asked sort of a second set of questions of Ms. Broussard. And those stem from an affidavit that she authored, that she attested to under oath. And that included one of the questions that I asked her during our session before lunch outside the presence of the jury was that no bank transfers were ever initiated by Mr. Gardner. And, Your Honor, I just want to be clear that Your Honor ruled that I cannot ask that question in front of the jury?") *and* ROA.5854 ("[B]ecause this is so critical to Mr. Gardner's defense, I wanted to make the record crystal clear that the Court's order is I cannot ask questions to this witness concerning the fact that, as to her knowledge, Mr. Gardner never initiated the transfers, did not have the authority to determine the amount of the transfers, did not determine the amount of the transfers. Am I clear that the Court is saying all of that is off limits?" "THE COURT: You know, and I understand what you're saying. Just those questions sound like they're just real simple and all that. But they're drawing out areas that are—that are, you know, are of real concern." "MS. JOHNSON: Okay. And then so, in support of this, we would proffer what's been marked as Defense 719. And that is Ms. Broussard's affidavit.").

## C.     The barred testimony was admissible.

Nothing in Ms. Broussard's testimony implicated (or even could have implicated) *Bruton v. United States*, 391 U.S. 123 (1968). *Bruton* held that a defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating confession of a nontestifying codefendant is introduced at their joint trial, even with a proper instruction. *Id.* at 137. Mr. Gardner never confessed to bank fraud, so there was no confession that could have implicated Simpson, and Ms. Broussard's testimony did not state or imply as much. Brass tacks: none of the testimony that Gardner sought to elicit from Broussard could have implicated *Bruton* because there wasn't a Gardner confession—let alone a Gardner confession that implicated Simpson. Gardner maintains that the district court's ruling was erroneous as the record clearly shows it was based on *Bruton*[167] and the government has so conceded.

Considering the government's post-trial renunciation of the *Bruton* argument it so forcefully championed at trial, however, Mr. Gardner, in

---

[167] *Cf.* ROA.5848-49 ("But I think on all three of them I'm going to say no questions on it. I'm not going to allow any questions on it because I believe it would be a Bruton violation and we'd be trying this case all over again.").

an abundance of caution, addresses why the cross-examination was not excludable hearsay, either.

### 1. The desired testimony was not hearsay.

The rule against hearsay bars the admission of a statement, other than one made by the declarant while testifying, offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c), 802. Mr. Gardner did not elicit any such statements. None of the questions (or broader prohibited areas) asked Ms. Broussard to repeat any statement that Gardner made.

To get around the fact that none of the prohibited questions or areas asked Ms. Broussard to repeat anything that Gardner said, the government (and Simpson) claimed that Gardner could not even ask Broussard a question, the answer to which could be based—even in part—on something that Gardner might have said. There is no legal support for this tortured definition of hearsay.

Testimony that conveys a witness's personal knowledge about a matter is not hearsay. *See Hafdahl v. Johnson,* 251 F.3d 528, 537 (5th Cir. 2001); *see also United States v. Vosburgh*, 602 F.3d 512, 539 n. 27 (3d Cir. 2010) (explaining without deciding that testimony about the victim's

58

age was not hearsay but personal knowledge acquired through review of vital statistics); *United States v. Simmons*, 773 F.2d 1455, 1460–61 (4th Cir. 1985) (testimony concerning the out-of-state location of a business was not hearsay because it reflected the witness's personal knowledge that the business had never had a manufacturing plant within the state); *United States v. Steel*, 759 F.2d 706, 712 (9th Cir. 1985) (testimony concerning the ownership of a vehicle was not hearsay because the testimony stemmed from the witness's personal knowledge).

Judge Posner of the Seventh Circuit explained,

> All perception is inferential, and most knowledge social; since Kant we have known that there is no unmediated contact between nature and thought. Knowledge acquired through others may still be personal knowledge within the meaning of Fed. R. Evid. 602, rather than hearsay, which is the repetition of a statement made by someone else— a statement offered on the authority of the out-of-court declarant and not vouched for as to truth by the actual witness. Such a statement is different from a statement of personal knowledge merely based, as most knowledge is based, on information obtained from other people.

*Agfa-Gevaert, A.G. v. A.B. Dick Co.*, 879 F.2d 1518, 1523 (7th Cir. 1989) (Posner, J.).

The government's direct examination and Mr. Gardner's examination of Ms. Broussard laid a foundation for her personal knowledge that Gardner never initiated a bank transfer, was frustrated by Jones's personal spending, did not like the companies' practice of transferring funds, and more generally, her thoughts, impressions, and perceptions. That foundation consisted of:

- Ms. Broussard's two-year employment as an accountant at United and Trinity, during which time she interacted daily with Gardner and worked with him close quarters.[168]

- Broussard's familiarity with Gardner's mannerisms, moods, attitude, tolerance for sloppy work, tolerance for disorganization, and when he was irritated.[169]

- Broussard's familiarity with the companies' payroll journals, bank statements, bank accounts, and bank reconciliation process.[170]

- Broussard's experience helping to prepare the companies' financial statements, balance sheets, and general ledgers.[171]

- Broussard's familiarity with Danny Jones's other companies, DMJ United Properties, DMJ Rentals, and the unbudgeted deposits into those companies from United and Trinity.[172]

- Broussard's role in transferring money between bank accounts.[173]

---

[168] ROA.5525, 5787, 5839.
[169] ROA.5839-40.
[170] ROA.5528, 5537-38, 5608-09, 5614.
[171] ROA.5538-39, 5561, 5796, 5802.
[172] ROA.5556, 5786.
[173] ROA.5565.

60

- Broussard's knowledge of the companies' accounting software, lack of online access to bank accounts, and how that impacted her ability to do her work, including debits and withdrawals made outside of the accounting department.[174]

- Gardner's and Broussard's combined efforts to improve the companies' practices and transparency by creating standard operating procedures and internal controls for the accounting department.[175]

The depth and breadth of Broussard's personal knowledge on these points satisfied Fed. R. Evid. 602. "Personal knowledge can include inferences and opinions, so long as they are grounded in personal observation and experience." *United States v. Cantu*, 167 F.3d 198, 204 (5th Cir. 1999) (*quoting United States v. Neal*, 36 F.3d 1190, 1206 (1st Cir. 1994)). A lay witness may state her opinion, under Rule 701, provided that opinion is "based on personal perception," "one that a normal person would form from those perceptions," and "helpful to the jury." *United States v. Ebron*, 683 F.3d 105, 136-37 (5th Cir. 2012). Such opinions "must be the product of reasoning processes familiar to the average person in everyday life." *Id*. (*quoting United States v. Yanez Sosa*, 513 F.3d 194, 200 (5th Cir. 2008)).

---

[174] ROA.5601-03, 5612-13.
[175] ROA.5780-81, 5790-92, 10401 (Ex. 760).

61

In *United States v. Evans*, 892 F.3d 692, 714–15 (5th Cir. 2018), *as revised* (July 6, 2018), this Court affirmed the propriety of opinion testimony by two witnesses who worked at a dental office in the same building—not even the same office—as the defendant's pain management clinic. They testified, based on their personal knowledge, that Evans ran a pill mill. *Id.* at 715. The pair observed the comings and goings for two years and searched Evans's office's trash. *Id.* That testimony, which was supported by considerably less foundation than Broussard's, was based on "commonsensical inferences a normal person would form based on years of observations," and personal observations, not hearsay, and not fanciful speculation. *Id.* (internal quotation marks and citations omitted). Application of the rules of evidence and case law interpreting them to the facts of this case—the foundation for Broussard's personal knowledge to answer the questions and areas barred—demonstrate that to the extent the court's ruling also rested on hearsay, it was error.

### 2. An FD-302 may be used to refresh a witness's recollection.

Ms. Broussard's testimony on direct contradicted her earlier statements on two important points: that Simpson, not Gardner, instructed her to write the Peoples Bank checks, and that Gardner never

initiated any bank transfer. To bring out those inconsistencies, Gardner attempted to refresh her recollection with the FD-302 of her interview, but was barred from doing so.

The FD-302 is an FBI form that agents use to memorialize their interviews. "Basically, '302s' capture the interviewing agent's notes of a witness interview, and they are routinely part of criminal investigations conducted by the agency." *United States v. Valas*, 40 F.4th 253, 258 (5th Cir. 2022). This Court has recognized the appropriate use of 302s to impeach witnesses concerning what they told an agent *and* to impeach the agent. *See id.* ("TJ was the crucial witness for the prosecution, the only one who actually accused Valas of criminal activity. And the agent who prepared this 302 also testified, so defense counsel was deprived of the opportunity to use the document in cross-examining two witnesses, not just one."); *United States v. Brown*, 303 F.3d 582, 588–89 (5th Cir. 2002) ("At trial, [Agent] Burton testified about his interview of Brown during his investigation into the Cascade settlement. Burton used his 302 to refresh his memory, but the 302 was not admitted into evidence."); *United States v. Hughes*, 230 F.3d 815, 819–20 (5th Cir. 2000) ("Thus, because Holmes's statement in the 302 FBI interview might have

63

impeached Chambers as to when Hughes learned that the money was illicit, the magistrate judge concluded that the statement was material for the purpose of Brady.").

Relevant here and as explained by one district court,

> Generally, counsel may ask the witness whether he or she previously made the statement to the FBI agent that is documented in the Form 302 memo. Counsel may also show the Form 302 memo to the witness for purposes of refreshing recollection. If the witness denies having made the statement, the defense may call the FBI agent and ask whether the witness made the prior statement. If the FBI agent denies it, the Form 302 memo may be used for purposes of impeachment of the FBI agent pursuant to Rule 613(b), not as substantive evidence.

*United States v. DaVita Inc.*, No. 1:21-CR-00229-RBJ, 2022 WL 833368, at *4 (D. Colo. Mar. 21, 2022) (*citing United States v. Crinel*, No. 15-cr-61, 2016 WL 6441249, at *5, 15 (E.D. La. Nov. 1, 2016)); *see also United States v. Stadtmauer*, 620 F.3d 238, 267 (3d Cir. 2010) (after witness did not recall making the statement, defense counsel showed the witness the 302 to refresh his recollection); *United States v. Ghailani*, 761 F. Supp. 2d 114, 124 (S.D.N.Y. 2011) (witness shown the relevant part of the 302 of his interview with the FBI for the purpose of determining whether it refreshed his recollection).

64

When Broussard testified that she did not recall telling the government that Simpson, not Gardner, instructed her to prepare the Peoples Bank checks, counsel should have been allowed to refresh her recollection by showing her the 302. The 302 is not admitted into evidence, but it may be used to refresh the witness's recollection in aid of impeaching her with a contradictory account. If the 302 refreshed Ms. Broussard's memory of her previous statement, mission accomplished. "And if she d[id]n't remember what she said, then the actual impeachment w[ould have] com[e] through the agent that made the 302." But the district court barred Gardner from refreshing Broussard's recollection, and the jury never heard about this critical inconsistency.[176]

### D.    The barred testimony was critical to Mr. Gardner's defense.

The limitations that the district court placed on cross-examination by sustaining objections to specific questions and by barring any questions on three broad areas cut off Mr. Gardner's defense at the knees. "Few rights are more fundamental than that of an accused to present

---

[176] ROA.5844.

witnesses in his own defense." *Chambers v. Mississippi*, <u>410 U.S. 284, 302</u> (1973).

The barred cross-examination was important because 1) Broussard's first-hand knowledge that Gardner did not like having to deal with the transfers ran counter to the prosecution's theory that Gardner conspired to execute transfers and desired to do so to obtain his salary and bonuses; 2) the fact that Simpson, not Gardner, instructed Broussard to prepare the Peoples Bank checks contradicted the centerpiece of the government's case against Gardner, as it was the only evidence that linked Gardner to Peoples Bank; and 3) the fact that Gardner never initiated any transfer countered the prosecution's theory of guilt, set forth in its opening statement:

> You will hear from Kassidy Broussard who will testify that on March 8th, 2017, Charles Gardner instructed her to write 25 checks drawn on six different accounts from Peoples Bank. Those checks, they had been written for $4 million.[177]
>
> ***
>
> As for the third bank, Peoples Bank, you will hear from its former president. You will hear how, even though Charles Gardner instructed Kassidy Broussard to write $4 million of checks off those accounts, he will review the statements with you.

---

[177] <u>ROA.4814</u>.

> And you will see that those accounts never had more than $2,000 available.[178]
>
> ***
>
> You will hear from employees in the United and the Trinity accounting department, as I mentioned earlier, Kassidy Broussard, Theresa Steinbruck. You will learn that Charlie Simpson and Charles Gardner instructed them on which accounts to use, how much money to move, when to make the transfers and how to spread the deposits out when they were making them.[179]

Ms. Broussard testified as the government promised in its opening, that Mr. Gardner instructed her to write the Peoples Bank checks.[180] That testimony stood, unimpeached and uncontradicted by her previous statements that said the opposite: it was Simpson, not Gardner who instructed her to write the Peoples Bank checks; Gardner never initiated a single bank transfer. The government bookended its case by arguing to the jury that Gardner directed the transfers:

- "You heard Kassidy Broussard and Theresa Steinbruck testify they were directed by Charlie Simpson and Charles Gardner to write two sets of checks every day."[181]

- "Simpson and Gardner knew how much to transfer because they had online access to the accounts."[182]

---

[178] ROA.4818.
[179] ROA.4820.
[180] ROA.5595.
[181] ROA.7199.
[182] ROA.7200.

67

- "By March of 2017, Simpson and Gardner had the accounting department making daily transfers between the accounts of about 30 checks a day worth more than one million dollars every day."[183]

- "The defendants knew when they needed to make deposits into the banks for them to post, they would tell the employees to deposit before a certain time every day."[184]

- "And [Gardner] knew exactly what checks were being written because it was employees in his department that he was directing to write them."[185]

The government also closed on Broussard's testimony that Gardner instructed her to write the Peoples Bank checks:

> Soon after Charlie Simpson messaged Mr. Elkins, Charles Gardner messaged Kassidy Broussard. Asked her to come see him. She did, and she was told that the companies were switching to the accounts at Peoples Bank and to write checks from those accounts.[186]

This fact was so central to Gardner's conviction that  even the district court relied it on it as a reason to deny his post-trial motions.[187] Broussard's importance informs the Sixth Amendment analysis: "the imperative of protecting a defendant's right to effective cross-

---

[183] ROA.7201.
[184] ROA.7202.
[185] ROA.7269.
[186] ROA.7207.
[187] ROA.14790.

68

examination is even more critical where, as here, the witness is crucial to the prosecution's case." *Wilkerson v. Cain,* 233 F.3d 886, 891 (5th Cir. 2000).

Was this evidence something on which a rational juror might conclude that there was a reasonable doubt? Yes. Did the exclusion of this evidence prevent the jury from evaluating the credibility and the weight that should be accorded to the evidence? Yes. "When cross-examining a witness, the defendant must be permitted to test both the witness's credibility and the witness's knowledge of the facts bearing on the defendant's guilt or innocence." *Sixth Amendment at Trial,* 91 Geo. L.J. 584, 593–94 (2003) (footnotes and citations omitted).

The jury returned a split verdict as to Gardner. Their verdict was close and they asked for a copy of Broussard's testimony.[188] Broussard was the most important witness to Gardner's defense. She worked more closely with Mr. Gardner than any other witness, and anyone else at United, but Gardner was barred from questioning Ms. Broussard about her impressions and observations that tended to exculpate him.

---

[188] ROA.15263.

The prohibited cross-examination contradicted Broussard's testimony that Gardner instructed her to write the checks. It supported his defense that he had limited information and did not have decision-making authority by demonstrating that after learning of Simpson's instructions to Broussard, Gardner gave her the checkbook she needed, and that the person to question about the checks was Simpson, not Gardner. The barred testimony that Mr. Gardner never initiated any transfer differed in quantity, quality, and impact from Broussard's testimony, in response to government questioning, that she received instructions from both defendants and "Charlie" determined the accounts and amounts, while "Charles" supervised the execution of the transfers.[189] Broussard's previous, sworn testimony that Gardner never initiated *any* transfer contradicted the context of that admitted testimony (and the government's theory of guilt as set forth in its opening statement). The mere fact that Simpson determined the amounts of the checks is not as powerful and does not separate Gardner from the knowledge and participation the way that Broussard's unequivocal but barred testimony would have. This example illustrates that the rulings

---

[189] ROA.5566.

70

prejudiced Mr. Gardner's defense because the points on each were not a matter of magnitude, but a direct contradiction of Broussard's testimony that undermined the prosecution's theory and supported Gardner's defense.

The exclusion of this kind of exculpatory evidence deprived Gardner of the basic right to have the prosecutor's case encounter and "survive the crucible of meaningful adversarial testing." *Crane*, 476 U.S. at 690–91 (citations omitted). The exclusion allowed significant portions of the case against Gardner to go unanswered. "Cross-examination is the principal means by which the believability of a witness and the truth of this testimony are tested." *Davis*, 415 U.S. at 316. Importantly, the limitations on Gardner's cross-examination of Broussard were not isolated—they applied to specific questions *and* entire areas of inquiry. *See Van Arsdall*, 475 at 679 (trial court's ruling violated the Confrontation Clause when it prohibited *all* inquiry into the witness's bias as a result of the State's dismissal of his pending charge).

The right to cross-examination is effectively denied when a defendant is prohibited from "expos[ing] to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw

71

inferences relating to the reliability of the witness." *Davis,* 415 U.S. at 318; *see Chambers,* 410 U.S. at 295. "The right to cross-examination includes the opportunity to show that a witness is biased, or that the testimony is exaggerated or unbelievable." *Pennsylvania v. Ritchie,* 480 U.S. 39, 51–53 (1987). "[A] denial of cross-examination without waiver ... would be constitutional error of the first magnitude." *Smith v. Illinois,* 390 U.S. 129, 131 (1968) (internal quotation marks omitted). The district court's preclusion of all inquiry by the defense on entire areas of the case violated that right and caused constitutional error.

## CONCLUSION

Charles Gardner appeals to this Court to vacate his conviction because the government pursued a legally insufficient theory of fraud at trial. Alternatively, the theory presented at trial worked a constructive amendment to the indictment, also entitling Mr. Gardner to vacatur.

SUBMITTED BY:

*/s/ Sara A. Johnson*
SARA A. JOHNSON
    LA. BAR NO. 31207
SARA A. JOHNSON, ATTORNEY AT LAW, LLC
700 Camp Street
New Orleans, Louisiana 70130
(504) 528-9500
sara@sarajohnsonlaw.com

**CERTIFICATE OF SERVICE**

This certifies that I filed the foregoing brief electronically using the CM/ECF system that automatically sends a notice and a copy to all counsel of record.

Dated: February 4, 2026     */s/ Sara A. Johnson*
                            Sara A. Johnson
                            Attorney for Charles D. Gardner

**CERTIFICATE OF COMPLIANCE**

1.  This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and 5th CIR. R. 32.1: this document contains 11,892 words.

2.  This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 5th CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

                            */s/ Sara A. Johnson*
                            Sara A. Johnson
                            Attorney for Charles D. Gardner

73